**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
MICHAEL T. HOUCHIN (SBN 305541)
*mike@consumersadvocates.com*
LILACH HALPERIN (SBN 323202)
*lilach@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone:(619) 696-9006
Facsimile: (619) 564-6665

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
         ykrivoshey@bursor.com

***Attorneys for Plaintiffs and the Proposed Class***

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY CUENCO and LINDA HONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>CLUBCORP USA, INC., CLUBCORP HOLDINGS, INC., CCA CLUB OPERATIONS HOLDINGS, LLC, CLUBCORP CLUB OPERATIONS, INC., CLUBCORP SYMPHONY TOWERS CLUB, INC., CLUBCORP SAN JOSE CLUB, INC., and DOES 1 to 10, inclusive,<br><br>Defendants. | Case No.: 3:20-cv-00774-JLS-AHG<br><br>CLASS ACTION<br><br>**FIRST AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Jeffrey Cuenco and Linda Hong ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants ClubCorp USA, Inc., ClubCorp Holdings, Inc., CCA Club Operations Holdings, LLC, ClubCorp Club Operations, Inc., ClubCorp Symphony Towers Club, Inc. d/b/a University Club atop Symphony Towers, ClubCorp San Jose Club, Inc. d/b/a Silicon Valley Capital Club, and Does 1 to 10, inclusive (collectively, "ClubCorp" or "Defendant").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge:

## INTRODUCTION

1.      This is a putative class action lawsuit on behalf of all similarly situated individuals who paid membership fees for access to Defendants' private golf, country, city, sports, and stadium clubs, and who, because of Defendants' response to the 2019 Coronavirus pandemic ("COVID-19"), lost the benefit of the membership for which they paid, and/or the services for which their fees were paid, without having their membership fees refunded to them.

2.      ClubCorp has made the unconscionable decision to keep charging its thousands of customers monthly membership fees while closing its private clubs as COVID-19 rages throughout the world and the United States economy has gone into a deep recession.  As discussed further below, by continuing to charge monthly membership dues while ClubCorp's private clubs remain closed, Defendants are unlawfully taking advantage of their customers in the midst of the greatest public health and economic crisis in living memory.

3.      Accordingly, Plaintiffs seek relief in this action individually, and on behalf of all of Defendants' customers nationwide, as well as all of Defendants' California customers, that have paid or were charged fees while Defendants' private clubs were closed.  Specifically, Plaintiffs bring claims against Defendants for: (i)

1

violations of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*; (ii) violations of California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*; (iii) violations of California's False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500, *et seq.*; (iv) breach of contract; (v) breach of express warranty; (vi) unjust enrichment/restitution; (vii) conversion; and (vii) money had and received.

## PARTIES

4.      Plaintiff Jeffrey Cuenco is a citizen of California, residing in San Diego County, California.  In or around December 2018, Mr. Cuenco entered into a month-to-month membership agreement with Defendants – with Defendant ClubCorp Symphony Towers Club, Inc. as signatory to that agreement, and, in that capacity, as an agent for any or all of the parent Defendants – for access to one of Defendants' private clubs.  Mr. Cuenco is a current member of Defendants' University Club atop Symphony Towers located in San Diego, California, and he pays $184.00 per month on a month-to-month basis, in addition to a $6.44 processing fee.  Mr. Cuenco has been a month-to-month member since he first signed up in approximately December of 2018.  In approximately March of 2020, Defendants closed their private clubs, including the University Club atop Symphony Towers in San Diego, California, that Mr. Cuenco attended.  Yet, Defendants have charged Mr. Cuenco $380.88 for his membership for the months of April, May and June even though Mr. Cuenco did not have access to any of Defendants' private clubs during those months. Further, Defendants have not refunded Mr. Cuenco any part of his monthly fee for the time in which Defendants' private clubs have remained closed.  Mr. Cuenco signed up for Defendants' month-to-month membership with the belief and on the basis that he would have access to Defendants' private clubs at any time during the month in which he was charged.  Mr. Cuenco would not have paid for the membership, or would not have paid for it on the same terms, had he known that he would not have

2

access to any of Defendants' private clubs.  Mr. Cuenco continues to face imminent harm, as Defendants continue charging their customers monthly fees while all of their private clubs remain closed.

5.     Plaintiff Linda Hong is a citizen of California, residing in San Jose, California.  In or around November 2019, Ms. Hong entered into a month-to-month membership agreement with Defendants – with Defendant ClubCorp San Jose Club, Inc. d/b/a Silicon Valley Capital Club as signatory to that agreement and an agent for any or all of the parent Defendants – for access to Defendants' private clubs.  Ms. Hong is a current member of Defendants' Silicon Valley Capital Club located in San Jose, California, and she pays "Home Club Dues" of $194.42 per month on a month-to-month basis.  During the first week of March 2020, ClubCorp closed its private clubs, including the Silicon Valley Capital Club that Ms. Hong attended, due to the COVID-19 pandemic.   Yet, ClubCorp has charged Ms. Hong $294.42 for her membership for the months of April, May and June even though Ms. Hong did not have access to any of Defendants' private clubs during those months.  Defendants have not refunded Ms. Hong any part of the monthly fee ClubCorp charged to her debit card for the time in which Defendants' private clubs have been closed.  Ms. Hong signed up for Defendants' month-to-month membership with the belief and on the basis that she would have access to Defendant Silicon Valley Capital Club's facilities during the time in which she was charged for her monthly membership.  Had Ms. Hong known that she would not have access to any of Defendants' private clubs, she would not have purchased the membership or would not have purchased it on the same terms.  Ms. Hong continues to face imminent harm, as Defendants continue charging their customers monthly fees while all of their private clubs remain closed.

6.     Defendant ClubCorp USA, Inc. ("ClubCorp USA") is a Delaware corporation that maintains its principal place of business at 3030 LBJ Freeway, Suite

3

600, Dallas, Texas 75234.  Defendant purports to be the largest owner and operator of private golf and country clubs in the country.  Through its various subsidiaries and affiliates, it owns or operates more than 200 clubs worldwide, including at least 19 subsidiary or affiliated clubs in California.  Defendant ClubCorp USA conducts business in California, including operation of the University Club atop Symphony Towers that Mr. Cuenco attended and the Silicon Valley Capital Club that Ms. Hong attended, which are also parties to this action.

7.     Defendant ClubCorp Holdings, Inc. ("ClubCorp Holdings") is a Nevada corporation with its principal place of business at 3030 LBJ Freeway, Suite 600, Dallas, Texas 75234.  Defendant ClubCorp Holdings conducts business in California, including operation of the University Club atop Symphony Towers that Mr. Cuenco attended and the Silicon Valley Capital Club that Ms. Hong attended, which are also parties to this action.

8.     Defendant CCA Club Operations Holdings, LLC ("CCA Holdings"), a wholly owned subsidiary of ClubCorp Holdings, is a Delaware limited liability corporation with its principal place of business at 3030 LBJ Freeway, Suite 600, Dallas, Texas 75234.  Defendant CCA conducts business in California, including operation of the University Club atop Symphony Towers that Mr. Cuenco attended and the Silicon Valley Capital Club that Ms. Hong attended, which are also parties to this action.

9.     Defendant ClubCorp Club Operations, Inc. ("ClubCorp Club Operations"), a wholly owned subsidiary of CCA Holdings, is a Delaware corporation with its principal place of business at 3030 LBJ Freeway, Suite 600, Dallas, Texas 75234.  Defendant ClubCorp Club Operations conducts business in California, including operation of the University Club atop Symphony Towers that Mr. Cuenco attended and the Silicon Valley Capital Club that Ms. Hong attended, which are also parties to this action.

10.     Defendant ClubCorp Symphony Towers Club, Inc. d/b/a University Club atop Symphony Towers is a Delaware corporation with its principal place of business is in San Diego, California.  ClubCorp Symphony Towers Club, Inc. is an affiliate, subsidiary, or otherwise associated with Defendants ClubCorp USA, ClubCorp Holdings, ClubCorp Club Operations, and/or CCA Holdings.

11.     Defendant ClubCorp San Jose Club, Inc. d/b/a Silicon Valley Capital Club is a Delaware corporation with its principal place of business is in San Jose, California.  ClubCorp San Jose Club, Inc. is an affiliate, subsidiary, or otherwise associated with Defendants ClubCorp USA, ClubCorp Holdings, ClubCorp Club Operations, and/or CCA Holdings.

12.     Defendants DOES 1 through 10, inclusive, are sued herein under fictitious names.  Their true names and capacities are unknown to Plaintiffs.  When their true names and capacities are ascertained, Plaintiffs will amend this complaint by inserting their true names and capacities herein.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that Plaintiffs' damages and injuries as herein alleged were proximately caused by such Defendants.

13.     Each defendant named herein, including all fictitiously named defendants, is and at all times mentioned was, the agent or employee of the remaining defendants.  In doing or failing to do the acts and practices hereafter allege, each defendant was acting in the course and scope of that agency or employment with the full consent, either express or implied, of each of the remaining defendants.

14.     Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who have knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

# FACTUAL ALLEGATIONS

## A.      Defendants Are All Alter Egos And/Or Agents Of Each Other

15.      As is set forth in detail below, ClubCorp and its subsidiaries are alter egos of one another because: (1) there is a unity of interest and ownership between the corporations such that their separate personalities do not actually exist; and (2) treating the corporations as separate entities would result in injustice.  Accordingly, the subsidiaries' contacts with the forum state – including those of Defendants ClubCorp Symphony Towers Club, Inc. and ClubCorp San Jose Club, Inc. d/b/a Silicon Valley Capital Club, which both maintain their principal places of business, and are thus "at home," in the State of California – are attributable to the ClubCorp parent companies for jurisdictional purposes.

16.      There is such unity of interest and ownership between the ClubCorp entities that the separate personalities of ClubCorp and its subsidiaries do not in reality exist.  As ClubCorp acknowledged, "[ClubCorp] operate[s] through [its] subsidiaries and [has] no material assets other than the stock of [its] subsidiaries." Moreover, ClubCorp controls the subsidiaries in their use and management of the facilities to such a degree as to render all such subsidiaries and facilities the mere instrumentalities of ClubCorp.  Stated otherwise, based on the following factors, it is clear that ClubCorp exercises such pervasive control over its subsidiaries that it effectively dictates every facet of the subsidiaries' businesses, from broad policy decisions to routine matters of day-to-day operation.

17.      First, there is evidence of commingling of funds and other assets of the ClubCorp entities.  For instance, ClubCorp has acknowledged that its "ability to pay dividends [to ClubCorp's executive directors and officers] is dependent on [its] receipt of dividends or other distributions from [its] subsidiaries and borrowings under the Secured Credit Facilities, the 2015 Senior Notes and other debt

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

instruments."  This and other statements contained in ClubCorp's 2016 SEC filing[1] indicate that profits from membership sales by ClubCorp's subsidiaries are concentrated in the ClubCorp parent companies.  Revenues flowing from the operations from different ClubCorp facilities are uniformly remitted to the ClubCorp parent company, which alone has the discretionary power to determine how such profits will be utilized.  ClubCorp next commingles the earnings from one subsidiary with the revenues and profits of other subsidiaries.  Then, at its discretion, ClubCorp disproportionately re-distributes or re-invests such revenues back into its facilities – a decision that ClubCorp reaches based on the comparative needs of the facilities rather than profit and success during the previous fiscal year.  In other words, ClubCorp does not re-invest in each of its facilities an amount equal to the profits realized by such facilities.  In fact, the least profitable facilities are most likely to be selected by ClubCorp for renovation in the hopes that revitalization of outdated facilities will result in larger long-term profits for ClubCorp (and potentially larger dividends for ClubCorp's corporate officers[2]).  Otherwise, if the revenues and assets of each facility were held separately from all other facilities' revenues and assets (they are not), then ClubCorp's "reinvention" approach[3] to revenue growth would

---

[1] For instance, ClubCorp stated that, following a major acquisition in 2014, ClubCorp's "network of private clubs increased, expanding the **geographic cluster model** and solidifying market penetration" in certain regions.  Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016 (emphasis added).

Generally, a cluster is a "provision for a single point of control for management of similar brands, properties and/or functions within a given geographic area."  Ronald A. Nykiel, *Co-ops, Consortiums, and Clusters*, Hospitality Net (Feb. 3, 2005), *available at* https://www.hospitalitynet.org/opinion/4022046.html (citing Ronald Nykiel, *Hospitality Management Strategies*, New Jersey: Prentice Hall (2004), p. 440).  Clusters in the marketing area include "lodging facilities in the same market area[,] **commingling [of the facilities'] sales activities**, [and] sharing leads and sales calls."

[2] *See* Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016 ("Our ability to pay dividends depends in part on our receipt of cash distributions from our operating subsidiaries[.]").

[3] *Id.* ("Through a combination of consumer research, experimentation, capital investment and relevant programming, we have sought to 'reinvent' the modern club experience to promote greater usage of our facilities.  For fiscal years 2007 through 2016, we have invested more than

7

not be possible without the appropriation of revenues produced by other, better performing facilities for the revitalization of underperforming facilities.[4]

18.     Second, ClubCorp has held out that it is liable for certain debts of its subsidiaries.   Significantly, ClubCorp's Form 10-K reveals that the subsidiaries acted as guarantors on long-term leases for ClubCorp Holdings Inc.[5]   In fact, ClubCorp expressly acknowledged that "[ClubCorp Holdings, Inc.] could remain obligated for performance guarantees in favor of third-party property owners or for their debt or other financial obligations."[6]   Additionally, ClubCorp noted that "[w]hen refunds are made, [ClubCorp Holdings, Inc.] must fund the payment of such amounts from our available cash.  If the number of refunds dramatically increases in the future, [ClubCorp's] financial condition could suffer and the funding requirement for such refunds could strain our cash on hand or otherwise force us to reduce or delay capital expenditures, reduce or eliminate planned dividend payments, sell assets or operations or seek additional capital to raise the cash necessary to make such refunds."[7]

---

[4] $690.0 million of capital to better position and maintain our clubs in their respective markets. This represents an investment of approximately 8.5% of our total revenues, for such period, to reinvent, upgrade, maintain, replace and build new and existing facilities and amenities focused on enhancing our members' experience."); *see also id.* ("The nature of our business requires us to invest capital to maintain our existing properties and invest in our information technology systems. … In addition to maintaining our properties, we also spend discretionary capital to expand and improve existing properties, including major reinventions, and expand our business through acquisitions."); *id.* ("We plan to use excess cash reserves, our revolving credit facility, proceeds from the issuance of debt or equity, or a combination thereof to expand the business through capital improvement and expansion projects and strategically selected club acquisitions.").

[4] *See also id.* ("As a result of our size and geographic diversity, our operating revenues and cash flows are not reliant on any one club or geographic region.").

[5] *Id.*

[6] *Id.*

[7] *Id.* ("If new debt is added to our current debt levels, the related risks that we and our subsidiaries now face could intensify.").

19. Third, ClubCorp maintains identical equitable ownership of its subsidiaries. ClubCorp Holdings, Inc. ("Holdings") and its wholly owned subsidiaries, CCA Club Operations Holdings, LLC ("Operations' Parent") and ClubCorp Club Operations, Inc. ("Operations" and, together with Holdings and Operations' Parent, "ClubCorp"), were formed on November 10, 2010, as part of a reorganization of ClubCorp, Inc., which was effective as of November 30, 2010.[8] In turn, Defendants ClubCorp Symphony Towers Club, Inc. and ClubCorp San Jose Club, Inc. d/b/a Silicon Valley Capital Club are "wholly and majority owned subsidiaries" of ClubCorp, as evidenced by "[t]he consolidated financial statements[, which] reflect the consolidated operations of ClubCorp" and its subsidiaries for Fiscal Year 2016.[9] Subsequently, on September 18, 2017, ClubCorp Holdings, Inc. and its subsidiaries and affiliates were acquired by Constellation Club Parent, Inc., a Delaware corporation. The surviving company is called ClubCorp Holdings, Inc. When the merger became effective,

> **all the properties, rights, privileges, immunities, powers, and franchises of the Company** [ClubCorp] and Merger Sub [Constellation Merger Sub. Inc., a Nevada corporation and wholly owned subsidiary of Constellation Club Parent. Inc., a Delaware corporation] shall vest in the Company as the Surviving Corporation and all claims, obligations, debts, liabilities and duties of the Company and Merger Sub **shall become the claims, obligations,**

---

[8] *See Notes To Unaudited Consolidated Financial Statements* (Dec. 27, 2016), *available at* http://eproxymaterials.com/interactive/mycc2016/pf/page_086.pdf; *see also id.* (noting that "ClubCorp, together with its subsidiaries, may be referred to as 'we', 'us', 'our' or the 'Company'"); see also Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016 ("Throughout this annual report on Form 10-K ('Form 10-K'), we refer to ClubCorp Holdings, Inc., together with its subsidiaries, as "we", 'us', 'our', 'ClubCorp' or the 'Company'.").

[9] *Id.*

9

**debts, liabilities and duties of the Company as the Surviving Corporation.**[10]

Thus, by the terms of the merger agreement, ClubCorp Holdings, Inc. has assumed the claims and obligations of both the pre-merger ClubCorp and its individual affiliated entities. Additionally, ClubCorp has identical ownership of its subsidiaries and facilities in that ClubCorp owns 100% of "the underlying real estate of 127 of [its] 159 golf and country clubs[,]" which ClubCorp "believe[s affords it] an advantage over other clubs as [it] retain[s for ClubCorp] the ability to maximize the value of [its] clubs and business." As ClubCorp explained, "[b]y owning the real estate underlying [its] clubs, [it has] been able to implement capital plans that inure to [its] benefit and generate positive returns on our investments. Owning many of [its own] assets also gives [ClubCorp] the flexibility to recycle [its] capital by selling underperforming clubs or non-essential tracts of land."[11]

20. Fourth, many of the ClubCorp entities share the same offices and/or employees. For instance, according to Form S-4 for ClubCorp Club Operations, Inc., filed with the SEC March 28, 2011, "[t]he address, including zip code, and telephone number, including area code, of each of the co-registrants [including the Silicon Valley Capital Club and the University Club atop Symphony Towers] is 3030 LBJ Freeway, Suite 600, Dallas, Texas 75234, Attn: General Counsel, (972) 243-6191."[12]

---

[10] *See* Form 8-K for ClubCorp Holdings, Inc., filed with the SEC July 10, 2017. Article 2.1 of the Agreement and Plan of Merger, by and among ClubCorp Holdings, Inc., Constellation Club Parent, Inc. and Constellation Merger Sub, Inc., attached as Exhibit 2.1 to the Form 8-K (emphasis added).

[11] Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016.

[12] *See* Form S-4 for ClubCorp Club Operations, Inc., filed with the SEC March 28, 2011, *available at* https://www.sec.gov/Archives/edgar/data/1515382/000104746911002747/a2202241zs-4.htm#di15001_compensation_discussion_and_analysis.

---

10

21.     Additionally, there is considerable overlap between the employees of ClubCorp and those of its subsidiaries.[13]  For instance, ClubCorp has "national sales and marketing teams [that] are led by four corporate professionals who, on average, have more than 20 years of tenure and collectively have almost 100 years of experience with us.  Their efforts include creating core and strategic membership offerings and corporate rate memberships."[14]  Further, "[t]o allow for maximization of golf rounds, [ClubCorp] employ[s] a corporate director of agronomy … who oversee[s ClubCorp's] strong agronomic practices, helping to extend golf play throughout the climate zones in which we operate."[15]

22.     ClubCorp also boasts having "a highly experienced professional management team [comprised of ClubCorp's] seven current executive officers had a combined 205 years of related career experience, including on average 24 years of hospitality and club specific experience through the end of fiscal year 2016."[16]  The sales, marketing, and management teams are all based out of ClubCorp's headquarters in Dallas, Texas, but they nevertheless maintain day-to-day responsibilities over ClubCorp operations at the individual club, regional, and national levels.  ClubCorp claims that its "management team continues to drive new membership sales, mitigate attrition and generate cash flows by delivering value to our members through modernization and enhancement of [ClubCorp] clubs and

---

[13] *See* Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016 ("As of February 21, 2017, we had approximately 18,300 employees, of which 14,900 are located at our golf and country clubs, 3,000 are located at our business, sports and alumni clubs and 400 are part of our corporate and regional staff.") (emphasis added).

[14] *Id.*; *see also id.* ("Our organic growth strategy is focused on employing an experienced membership sales force, leveraging our portfolio and alliance offerings and developing new and relevant programming. … We believe our well-trained and incentivized sales team will continue to drive membership growth, and we believe we are well-positioned to capitalize on improving economic conditions.").

[15] *Id.*

[16] *Id.*

11

upgrade programs, improving operating efficiencies and expanding our portfolio through acquisitions."[17]

23.     Furthermore, ClubCorp has developed several programs and departments – and has hired numerous corporate-level employees for the purpose of administrating those programs and/or heading those departments – that are fundamentally designed to allow ClubCorp to exercise and maintain control over the day-to-day operations of its geographically diverse subsidiaries from its corporate headquarters in Dallas, Texas.   For instance, ClubCorp provides full-service management and management consulting to [various ClubCorp-branded] private clubs, premier resort and daily-fee golf courses, and city clubs" through its affiliate, "ClubLife Management."[18]   ClubLife Management consists of "a dedicated team of senior executives" that work to provide facilities with "access to ClubCorp's supplier purchasing power, leading technology platform and cutting-edge digital marketing[,] and its] worldwide network of over 300+ country clubs, city and stadium clubs."   ClubCorp also developed "ClubLine, []a concierge service for Members of ClubCorp clubs."[19]   In connection with ClubLine, ClubCorp employs a "team consist[ing] of 50+ Employee Partners who assist Members in using their local and traveling benefits[ and, in doing so] conduct 1,500 conversations on average per day with [ClubCorp] Members!"[20]   Notably, ClubLine's stated mission

---

[17] *Id.* ClubCorp has expressed concerns that its "***future success is substantially dependent on the continued service of [its] senior management and key employees***" and that "[t]he loss of the services of [ClubCorp's] senior management could make it more difficult to successfully operate [the] business and achieve [ClubCorp's] business goals."   *Id.* (emphasis in original).

[18] *See* https://www.clubcorp.com/Shared-Global-Content/Press-Releases/Press-Releases-Shared-Content-Folder/Press-Releases/Tabbed-Content/2020-Press-Releases/ClubLife-Management-Announces-Greg-Griffin-as-Director-of-Corporate-Development; *see also*

[19] https://clubcorpjobs.com/reservations-concierge-inbound-call-center-aci-dallas-texas-140045/.

[20] *See also id.* ("[ClubLine member service representatives must be polite] and tactful [in] response to general inquiries for information and club inquiries from all levels, including management[,

12

– "to exceed Members' expectations as [service representatives] accommodate their traveling needs and reservations"[21] – treats members of particular ClubCorp facilities as members of their parent corporations and/or the broader ClubCorp family.  ClubCorp also created membership programming, such as its "Optimal Network Experience" ("O.N.E.") product, "which provides members access to benefits and special offerings in their local community, network-wide and beyond, in addition to benefits at their home club."[22]

24.  Lastly, "[i]n addition to its portfolio of more than 200 owned or operated golf and country clubs, city clubs, sports clubs, alumni clubs and stadium clubs, ClubCorp has developed a Network of more than 300 owned, operated and alliance clubs and special offerings at more than 1,000 hotels, resorts, restaurants and entertainment venues."  According to ClubCorp, "[t]hese alliances combine to provide [ClubCorp] Members with unprecedented access to a world of private clubs and premium benefits."  Specifically, "[t]hrough [its] membership alliances program, ClubCorp enables [its subsidiaries] to revolutionize their approach to customer recognition and employee retention by providing fully customized private label access to the ClubCorp network for their most valued constituents."[23]

---

must be k]nowledgeable about 500+ properties and services[, and must m]ail[] quality assurance surveys to Members after visit to a ClubCorp club[.]").

[21] *Id.*

[22] Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016.
ClubCorp describes O.N.E. as its "industry-leading benefits program." https://www.clubcorp.com/Membership.  Through O.N.E., "Members enjoy a world of premium benefits across the ClubCorp Network."  *Id.*  For instance, "Home Clubs offer My Club benefits such as 50% off* à la carte dining or another special offer."  Additionally, "[w]hen traveling outside their home market, [O.N.E.] Members have access to My World benefits including free* golf and free* dining at clubs, and so much more!"  *Id.*

[23] https://www.clubcorp.com/Who-We-Are/Our-Alliances/Membership-Alliances2.

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

25.     Fifth, ClubCorp and its subsidiaries have overlapping officers and directors.  Additionally, ClubCorp provides insurance coverage for its subsidiaries.[24] ClubCorp "properties are covered by [] property, casualty and commercial liability insurance[,]" as well as "other insurance, including directors and officers liability insurance, fiduciary coverage and workers' compensation."[25]   ClubCorp is the named insured on these insurance policies, which cover ClubCorp subsidiaries.

26.     Sixth, ClubCorp is under-capitalized, as is reflected by a recent downgrade by Moody's Investors Service of ClubCorp's Corporate Family Rating (CFR), its Probability of Default Rating, and the ratings on the company's senior secured first lien credit facilities.[26]  According to Moody's credit rating dated April 2020,

> downgrades and negative outlook reflects ClubCorp's high financial leverage with debt/EBITDA at around 7.3x …, negative free cash flow, and Moody's expectations that headwinds stemming from the coronavirus outbreak will pressure earnings and cash flow generation over the next 12-18 months. … Moody's expects the social distancing measures and closure of on-premise dining as a response to the coronavirus pandemic and the related weakness in economic conditions, will lower guest visitations which could increase attrition, and will negatively impact the company's operating results in 2020. Given the anticipated decline in the company's earnings, debt/EBITDA financial leverage is expected to increase to

---

[24] Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016.

[25] *Id.*; *see also id.* ("We carry commercial liability, employer practices, wage and hour, fire, flood, earthquake, catastrophic wind and extended insurance coverage, as applicable, from solvent insurance carriers on all of our properties. We believe that … all of our existing golf and business clubs are insured within industry standards.").

[26] *Moody's downgrades ClubCorp to Caa1; outlook negative*, Moody's Investors Service (Apr. 9, 2020), *available at* https://www.moodys.com/research/Moodys-downgrades-ClubCorp-to-Caa1-outlook-negative--PR_422089.

14

over 7.5x and free cash flow generation will continue to be pressured.[27]

Additionally, ClubCorp has expressed concerns that "[t]he illiquidity of real estate may make it difficult for [ClubCorp] to dispose of one or more of our properties or negatively affect our ability to profitably sell such properties."[28]

27.     Seventh, there is a lack of segregation between ClubCorp's and its subsidiaries' corporate records.  For instance, ClubCorp presents itself as one integrated company on its website,[29] in government filings (every financial report ClubCorp Holding, Inc. filed with the SEC over the past ten years is a consolidated report containing collective revenue data based on the aggregate annual performance of all subsidiaries),[30] and in other materials used for marketing purposes.[31]

---

[27] *Id.*

[28] Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016; *see also After calls for sale, ClubCorp forms committee to 'unlock the value'*, Dallas Business Journal (Jan. 13, 2017), *available at* https://www.bizjournals.com/dallas/news/2017/01/13/after-calls-for-sale-clubcorp-forms-committee-to.html.

[29] *See* https://www.clubcorp.com/Legal/Terms-of-Use ("All copyrighted and copyrightable materials on this site, … are copyrighted, ALL RIGHTS RESERVED, by ClubCorp USA, Inc. or its affiliates[.]"); *see also id.* (acknowledging that "the parties involved in creating, producing, or delivering [the ClubCorp website] includ[e] … ClubCorp, its officers, directors, agents, affiliates, owners [and] subsidiaries"); *id.* ("Any legal notices regarding the Site should be sent to ClubCorp USA, Inc., Attn: General Counsel, P.O. Box 819012, Dallas, Texas 75381-9012.").

[30] *See, e.g.*, Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016 ("Throughout this annual report on Form 10-K ('Form 10-K'), we refer to ClubCorp Holdings, Inc., together with its subsidiaries, as "we", 'us', 'our', 'ClubCorp' or the 'Company'.").

[31] ClubCorp "market[s] and promote[s ClubCorp] member benefits through [its] in-house marketing tools, including member e-newsletters and e-communications, our internally developed online Benefits Finder, other social media applications and our quarterly-distributed proprietary *Private Clubs* magazine." Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016. ClubCorp's "strategic alliance partners also support [its] marketing efforts with targeted advertisement, including direct mail." *Id.* Lastly, ClubCorp "make[s] reservations convenient for members by providing an in-house concierge (ClubLine), and by offering access to an inventory of VIP tickets through our own web portal (TicketLine)." *Id.*

15

28.     Finally, ClubCorp uses its subsidiaries as mere shells or conduits for the affairs of other subsidiaries and/or ClubCorp entities.  According to a 2019 lawsuit brought, at the request of Texas Comptroller of Public Accounts Glenn Hegar, by the State of Texas against Defendants ClubCorp Holdings, Inc. and other ClubCorp related entities, ClubCorp has a history of creating new legal entities to avoid or diminish its liabilities.  Specifically, on or around August 26, 2009, now-retired ClubCorp CEO Eric Affeldt attempted to circumvent the pending bad outcome of the Texas audit by creating 27 Oklahoma entities by merging Texas-chartered ClubCorp entities into these newly created entities.  This frenzied attempt to remove ClubCorp's liability from the subsidiaries and other related entities under audit proved fruitless.  Rejecting ClubCorp's argument that the Comptroller "was directing its demand to the wrong entity-the parent company (ClubCorp Holdings, Inc.) rather than each individual club[,]" Comptroller Hegar reasoned that, although the mergers were legal, the transactions did nothing to extinguish the underlying liabilities ClubCorp owed to the state of Texas:

> [O]n or around August 26, 2009, Mr. Affeldt created 27 Oklahoma entities, then under individual plans of merger executed documents to merge the 27 Texas-chartered ClubCorp entities into newly created Oklahoma entities with similar names.  The Oklahoma entities were the survivors of the mergers and continue to exist.  According to the merger documents all ownership shares of the Texas entities were converted to shares in the Oklahoma entities.  ClubCorp slashed the amount of unclaimed property held by Texas-chartered entities within the state, **this act by ClubCorp did *not* extinguish** the members' or former members' ownership rights in their property, or **ClubCorp's liability for the [acts of] … the resulting entities**[.][32]

---

[32] *Texas v. Clubcorp Holdings*, 1:19-CV-00171-LY (W.D. Tex. Nov. 5, 2019).

16

Similarly here, ClubCorp has deliberately set up empty shells and agents to deceive the public as to who is actually responsible for the decisions made at each of the ClubCorp facilities, while also siphoning funds out of the facilities.

29.     In reality, ClubCorp is directly involved in and maintains control over the routine day-to-day management and operations of its facilities, such as hiring and firing decisions,[33] negotiating contracts,[34] and making routine purchase decisions.[35]   By contrast, none of the subsidiaries have any right to control the operations of ClubCorp.  ClubCorp executives make any and all material decisions for the subsidiaries, especially with respect to their operation of the facilities.  At any rate, all ClubCorp entities, including ClubCorp's parent companies, its wholly owned subsidiaries, and any other affiliates or entities over which ClubCorp, operate their respective businesses with a single, unified mission – "the central purpose of building the relationships and enriching the lives of [ClubCorp's] Members."[36]

---

[33] *See, e.g.,* https://www.clubcorpcoronavirusresponse.com/members ("We've had to make some very difficult decisions over the past few days – extremely hard and heart-wrenching. We have furloughed almost 50% of our Employees in both our clubs and home office. We continue to have thousands of Employees still serving our Members and maintaining our courses and clubhouses."); *see also* Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016 ("As of February 21, 2017, we had approximately 18,300 employees, of which 14,900 are located at our golf and country clubs, 3,000 are located at our business, sports and alumni clubs and 400 are part of our corporate and regional staff.").

[34] All membership agreements of the facilities are – and have always been – drafted by ClubCorp. While the specific wording of the agreements varies somewhat, they all provide the same or similar material terms.

[35] *See* Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016 ("We must regularly expend capital to construct, maintain and renovate the properties that we own in order to remain competitive[.] … In addition, we must periodically upgrade or replace the furniture, fixtures and equipment necessary to operate our business.").

[36] *See, e.g.*, https://www.clubcorp.com/Who-We-Are/Our-Purpose ("Since its inception in 1957 in Dallas, Texas, ClubCorp has operated with the central purpose of building the relationships and enriching the lives of its Members. As the largest owner and operator of private clubs, ClubCorp brings its Members a higher and more consistent level of service and an unwavering commitment to make the club the Members' home away from home.") (emphasis added).

17

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

30.     ClubCorp benefits by attaching its brand name to subsidiary owned or operated private clubs.   In the nearly 70 years since ClubCorp was founded, consumers have become familiar with and have grown respect for the ClubCorp name, and when consumers see that brand name attached to ClubCorp's collection of clubs, such marketing and advertising creates a natural and reasonable impression that ClubCorp is the owner of such facilities bearing its name and featured on its website.   ClubCorp is aware that its marketing practices create consumer confusion, and it is eager to take advantage of that confusion.[37]

31.     ClubCorp should not be permitted to enjoy all the benefits of a cohesive single-entity business while avoiding the correlating liabilities.   Accordingly, it would be inequitable and promote injustice for ClubCorp to escape liability for obligations incurred by its subsidiaries as much for the benefit of ClubCorp as for the benefit of ClubCorp's subsidiary-run facilities.

32.     For the foregoing reasons, ClubCorp and its subsidiaries were engaged at all relevant times in a single business enterprise of developing, marketing, and distributing membership agreements in exchange for private club access, and ClubCorp dominated its subsidiaries and controlled the day-to-day operations of its private club facilities.

33.     All Defendants named in this Complaint have committed the requisite tortious actions giving rise to Plaintiffs' claims. Alternatively, Plaintiffs allege that

---

[37] *See, e.g.*, Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016 ("We believe the ability to offer access to our collection of clubs provides us a significant competitive advantage in pursuing acquisitions and that the fragmented nature of the private club industry presents significant opportunities for us to expand our portfolio by leveraging our operational expertise and by taking advantage of market conditions."); *id.* ("By providing members with numerous services and amenities that extend beyond their home clubs to all of the clubs we own and operate and the clubs with which we have alliances, we believe we can drive membership growth and create a key market differentiator which would be difficult for our competitors to replicate. … We believe the size of our portfolio of clubs provides us with significant economies of scale, creating operational synergies across our clubs and enabling us to consolidate our human resources, sales and marketing, accounting and technology departments. We also benefit from centralized purchasing to receive preferred pricing on supplies, equipment and insurance.").

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

Defendant ClubCorp USA, Inc. is primarily liable and that ClubCorp Holdings, Inc., ClubCorp Club Operations, Inc., CCA Club Operations Holdings, LLC, ClubCorp Symphony Towers Club, Inc., and ClubCorp San Jose Club, Inc. d/b/a Silicon Valley Capital Club are liable by aiding and abetting the commissions of Defendant ClubCorp USA, Inc.'s tortious conduct by providing it with substantial assistance and encouragement with knowledge of Defendant ClubCorp USA, Inc.'s wrongful conduct.

### B. Defendants' Business: The Private Club Industry

34.    ClubCorp is the owner and operator of more than 200 private clubs[38] throughout the United States, including approximately 19 locations in California alone[39], making it the "largest owner and operator of … [private] clubs in markets all across the country."[40]   In fact, ClubCorp brags that it is "The World Leader in Private Clubs":



35.    ClubCorp offers monthly memberships to its customers that allow them access to "a world of premium benefits across the ClubCorp Network."[41] Membership to one of ClubCorp's private clubs provides members with "first-class amenities and benefits at [their] Home Club[s,]" in addition to "access to the

---

[38] https://www.clubcorp.com/ (last visited April 23, 2020).

[39] https://www.clubcorp.com/Find-a-Club (last visited April 23, 2020).

[40] https://www.clubcorp.com/Who-We-Are (last visited May 13, 2020).

[41] https://www.clubcorp.com/Membership (last visited April 23, 2020).

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

ClubCorp Network of … alliance clubs, and special offerings at more than 1,000 hotels, resorts[,] and entertainment venues[.]"[42]

36.   To sign up for one of ClubCorp's month-to-month membership program, customers provide ClubCorp with their credit card or debit card information. ClubCorp then automatically charges customers' credit or debit cards as payments are due on a monthly basis.

37.   ClubCorp's private clubs are, for the most part, currently inaccessible and non-operational. In approximately March of 2020, ClubCorp closed its private clubs due to the COVID-19 pandemic. However, unlike most of its competitors, ClubCorp continued charging its members monthly membership fees— at full price.[43] ClubCorp is able to unilaterally charge its customers monthly fees without their consent, as it is in possession of its members' debit and credit card information. Thus, ClubCorp has made the deliberate decision to bilk its customers out of a monthly membership fee while its members do not have access to ClubCorp facilities, as well as most other benefits of membership associated with such facilities.

38.   The scope of this conduct cannot be overlooked. As of December 31, 2019, ClubCorp reported having more than 430,000 members[44] who pay monthly

---

[42] https://www.clubcorp.com/Membership (last visited May 13, 2020).

[43] For instance, numerous gyms have, on their own accord, announced that membership charges will be suspended during Coronavirus-related closures. *See, e.g., Equinox* https://www.equinox.com/covid19update?icmp=banner-covid ("Your membership will be put on freeze at no cost as of the day the club closed. No further action is required to freeze.") (last accessed May 13, 2020); *Blink Fitness* https://www.blog.blinkfitness.com/blink-fitness-gym-updates ("What happens to my membership if my gym is closed? You will not be billed during the time that your Blink gym is closed. Your membership will be put on freeze until we re-open. No action is needed on your part to start the freeze.") (last visited May 13, 2020); *Barry's BootCamp* https://www.barrys.com/covid-19/ ("For any existing reservations, we will return these classes to your account. Additionally, all class packages and memberships will be adjusted to reflect the duration of these closures.") (last visited May 13, 2020).

[44] https://www.clubcorp.com/Who-We-Are/History-Facts (last visited May 13, 2020).

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

membership dues, which vary in price and range from $120.00 for social memberships to over $800.00 for certain golf club memberships.[45]  The sole reason ClubCorp customers pay monthly membership fees is to have access to ClubCorp's private clubs.   That is, by contract and by law, Defendants charge customers membership dues strictly *in exchange for access to Defendants' private clubs*.  Now, however, ClubCorp is charging customers the full price associated with their memberships while denying the same customers access to its private clubs. Moreover, despite failing to provide the services agreed upon in their contracts with members, ClubCorp has refused to issue refunds for such charges, exacerbating the already enormous financial strain currently plaguing people across the United States due to "shelter-in-place" regulations, business closures, abrupt mass layoffs, and the recent market collapse.

39.   ClubCorp's steadfast refusal to refund any portion of wrongfully collected membership fees is central to its business model.  Since ClubCorp was founded in 1957, ClubCorp has relied on membership fees to fund its operations and expansion through development and acquisitions.  As ClubCorp founder Robert H. Dedman, Sr. explained in his autobiography, "[t]o be a good entrepreneur, you have to know how to intelligently use what we call OPM, 'Other People's Money….'  If we didn't sell memberships, we couldn't meet our construction payments on the subsequent phases."[46]

---

[45] https://www.clubcorp.com/content/download/742266/7860466/version/1/file/CVCC2015Membership-Classifications-Flyer3.pdf (last visited April 23, 2020).

[46] *See King of Clubs: Grow Rich in More Than Money* (Taylor Publishing Company, 1999), Dedman Robert H. ("King of Clubs"), p. 172.  In fact, Mr. Dedman joked about ClubCorp's successful use of OPM in his autobiography, where he discussed the "developer's creed:"  "A dollar borrowed is a dollar earned.  A dollar refinanced is a dollar saved.  And a dollar paid back is a dollar lost forever."  *Id.* at p. 86.

21

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

40.     Indeed, ClubCorp has expressly acknowledged that refunding membership fees *en masse* would have a material negative impact on its operations.[47]  In particular, ClubCorp's current state – which is marked by "high financial leverage with debt[,] … negative free cash flow, and … exposure to US quarantines and discretionary consumer spending" – has rendered ClubCorp "vulnerable to shifts in market sentiment in these unprecedented operating conditions[.]"[48]  Therefore, instead of instituting responsible financial transaction policies, ClubCorp has decided to attempt to shift its financial losses onto its hundreds of thousands of innocent members by continuing to charge customers for their monthly memberships without providing any of the benefits of membership.  In doing so, ClubCorp well exceeds the scope of its contractual authority to initiate credit or debit entries to members' bank accounts.

41.     By charging post-closure membership fees to customers' credit and debit cards, Defendants have breached their agreements with Plaintiffs and members of the Class, who suffered monetary losses in the monthly amounts charged.  In this regard, Defendants' conduct is the height of corporate greed, and it underscores Defendants' natural inclination to place profits before people.

### JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all

---

[47] *See* Form 10-K for ClubCorp Holdings, Inc., filed with the SEC in 2016, p. 18 ("***We could be required to make material cash outlays in future periods if the number of initiation deposit refund requests we receive materially increases***[.] … If the number of refunds dramatically increases in the future, our financial condition could suffer and the funding requirement for such refunds could strain our cash on hand or otherwise force us to reduce or delay capital expenditures, reduce or eliminate planned dividend payments, sell assets or operations or seek additional capital in order to raise the cash necessary to make such refunds.") (emphasis in original), *available at* https://www.sec.gov/Archives/edgar/data/1577095/000104746913007531/a2215780zs-1.htm#da40401_risk_factors (last visited May 13, 2020).

[48] *See* https://www.moodys.com/research/Moodys-downgrades-ClubCorp-to-Caa1-outlook-negative--PR_422089?cid= (last visited May 13, 2020).

members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, there are over 100 members of the putative class, and most members of the proposed nationwide class are citizens of states different from the states of Defendants.

43.    This Court has personal jurisdiction over Defendants because they conduct substantial business within California such that Defendants have systematic, continuous, and pervasive contacts with the State of California.

44.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims took place within this District and documents and witnesses are likely to be located within this District. Moreover, Defendants distributed, advertised, and sold memberships to their private clubs, which is the subject of the present complaint, in this District.

## CLASS ACTION ALLEGATIONS

45.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons in the United States who, during the period in which Defendants' private clubs were closed, up to and including the date of final judgment in this action, incurred fee(s) in connection with Defendants' membership plan offerings.

46.    Plaintiffs also seek to represent a subclass defined as all members of the Class who are members at a private club in California (the "California Subclass" or "Subclass").

47.    Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

48.    Excluded from the Class are Defendants, officers and directors of Defendants at all relevant times, members of Defendants' immediate families and

23

their legal representatives, heirs, successors or assigns, and any subsidiary, affiliate, or otherwise associated entity in which Defendants have or had a controlling interest.

49.     Plaintiffs are members of the Class and California Subclass they seek to represent.

50.     **Numerosity.**  Defendants have hundreds of thousands of customers nationwide that have paid or were charged fees while Defendants' private clubs were closed. Accordingly, members of the Class are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.

51.     **Commonality and Predominance**.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to whether Defendants have breached contracts with their customers and whether their actions are fraudulent and unlawful.

52.     **Typicality.**  The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class were exposed to Defendants' false and misleading advertising and sustained damages as a result of Defendants' uniform wrongful conduct in that Defendants unlawfully charged membership fee(s) to Plaintiffs' and Class members' bank accounts without providing Plaintiffs and the Class the access to Defendants' private clubs for which they paid, depriving Plaintiffs and members of the Class of the benefit of their bargain .

53.     **Adequacy**.  Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the Class members Plaintiffs seek to represent, Plaintiffs have retained competent counsel experienced in prosecuting class actions, and Plaintiffs intend to prosecute this action vigorously.

The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

54.   **Superiority**.  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

55.   Defendants have acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

56.   Without a class action, Defendants will continue a course of action that will result in further damages to Plaintiffs and members of the Class and Defendants will likely retain the benefits of their wrongdoing.

57.   Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

25

## COUNT I

**Violations of California's Consumers Legal Remedies Act,**

**Cal. Civ. Code §§ 1750, *et seq.***

58.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

59.     Plaintiffs bring this claim individually and on behalf of members of the proposed California Subclass against Defendants.

60.     Plaintiffs and Class members are consumers who paid fees for use of Defendants' private clubs for personal, family or household purposes.  Plaintiffs and the members of the California Subclass are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

61.     The provision of access to Defendants' private clubs – the benefit for which Plaintiffs and California Subclass members bargained, contracted, and paid Defendants – is a "service" within the meaning of Cal. Civ. Code § 1761(b).  The purchases by Plaintiffs and the California Subclass are "transactions" within the meaning of Cal. Civ. Code § 1761(e).

62.     Defendants' actions, representations, and conduct violated, and continue to violate, California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, because they extend to transactions that Defendants intended to result, or have resulted in, the sale of services to consumers.

63.     Defendants' advertising that their private clubs would be available to their customers and that customers would have access to their private clubs upon paying a membership fee is false and misleading to a reasonable consumer, including Plaintiffs, because Defendants in fact closed all of their private clubs while continuing to charge  customers the full price of membership.

64.     Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  By engaging in the conduct set forth herein, Defendants violated, and continue to violate, Section 1770(a)(5) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendants misrepresented the particular characteristics, benefits, and quantities of the services.

65.    Cal. Civ. Code § 1770(a)(7) prohibits representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.  By engaging in the conduct set forth herein, Defendants violated, and continue to violate, Section 1770(a)(7) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendants misrepresented the particular standard, quality, or grade of the services.

66.    Cal. Civ. Code § 1770(a)(9) further prohibits "[a]dvertising goods or services with intent not to sell them as advertised."  By engaging in the conduct set forth herein, Defendants violated, and continue to violate, Section 1770(a)(9), because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendants advertise services with the intent not to sell the services as advertised.

67.    Plaintiffs and the California Subclass acted reasonably when they purchased Defendants' private club memberships on the belief that Defendants' representations were true and lawful.

68.    The acts and practices of Defendants as described above were intended to deceive Plaintiffs and the California Subclass as described herein, and have resulted, and will continue to result, in damages to Plaintiffs and the California Subclass.

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

69.     Plaintiffs and the California Subclass suffered injuries caused by Defendants because:  (a) they would not have purchased or paid for Defendants' private club memberships absent Defendants' representations and/or omission that it would continue charging customers' credit cards and debit cards while all private clubs nationwide are closed; (b) they would not have purchased private club memberships on the same terms absent Defendants' representations and omissions; (c) they paid a price premium for Defendants' private club memberships based on Defendants' misrepresentations and omissions; and (d) Defendants' private club memberships did not have the characteristics, benefits, or quantities as promised.

70.     Pursuant to California Civil Code § 1780(a), Plaintiffs and members of the California Subclass seek injunctive and equitable relief for Defendants' violations of the CLRA.

71.     In compliance with the provisions of California Civil Code § 1782, Plaintiff Jeffrey Cuenco sent written notice to Defendant ClubCorp USA, Inc. on April 30, 2020, and Plaintiff Linda Hong sent written notice to Defendant ClubCorp USA, Inc. on May 19, 2020, informing Defendants of their intention to seek damages under California Civil Code § 1750.  The letters were sent via certified mail, return request, advising Defendants that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letters expressly stated that they were sent on behalf of Plaintiffs and "all other persons similarly situated."  More than thirty days have passed since the written notice letters were sent and Defendants have failed to take the corrective action described in Plaintiffs' letters. Accordingly, Plaintiffs, individually and on behalf of the proposed California Subclass, seek damages from Defendants as permitted by Civil Code § 1782(d) for Defendants' violations of the CLRA.

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

## COUNT II

### Violations of California's Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

72.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

73.    Plaintiffs bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

74.    Defendants are subject to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

75.    Defendants' advertising that their private clubs would be available to their customers, and that their customers would have access to one or more ClubCorp facilities upon paying a membership fee is false and misleading to a reasonable consumer, including Plaintiffs, because Defendants in fact closed all of their private clubs while continuing to charge customers the full price of private club membership.

76.    Defendants' business practices, described herein, violated the "unlawful" prong of the UCL by violating the CLRA, the FAL, and other applicable law as described herein.

77.    Defendants' business practices, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.  Defendants' advertising and their practice of charging membership fees while their private clubs are closed is of no benefit to consumers.

78.     Defendants violated the fraudulent prong of the UCL by misleading Plaintiffs and the California Subclass to believe that they would only be charged fees when they would have access to Defendants' private clubs.

79.     Plaintiffs and the California Subclass acted reasonably when they signed up for memberships based on the belief that they would only be charged fees when Defendants' private clubs were open and accessible during normally scheduled business hours.

80.     Plaintiffs and the California Subclass lost money or property as a result of Defendants' UCL violations because:  (a) they would not have purchased or paid for Defendants' private club memberships absent Defendants' representations and omission of a warning that it would continue charging customers' credit cards and debit cards while all private clubs nationwide are closed; (b) they would not have purchased private club memberships on the same terms absent Defendants' representations and omissions; (c) they paid a price premium for Defendants' private club membership based on Defendants' misrepresentations and omissions; and (d) Defendants' private club memberships did not have the characteristics, benefits, or quantities as promised.

## COUNT III

### Violations of California's False Advertising Law,
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

81.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

82.     Plaintiffs bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

83.     California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device

30

... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

84.    Defendants engaged in a scheme of charging customers full monthly membership fees while their private clubs were closed.  By advertising and/or marketing their private clubs and facilities as being accessible during the membership fee period, Defendants misrepresented and/or omitted the true content and nature of Defendants' services. Defendants knew or should have known that these statements were, or would likely become, unauthorized, inaccurate, and misleading.

85.    Defendants' advertising that their private clubs would be available to customers during the membership period, and that their customers would have access to their private clubs upon paying a membership fee is false and misleading to a reasonable consumer, including Plaintiffs, because Defendants in fact closed all of their private clubs while continuing to charge their customers the full price of private club membership.

86.    Defendants violated the FAL by misleading Plaintiffs and the California Subclass to believe that they would be charged fees only when they have access to Defendants' private clubs.

87.    Defendants knew or should have known, through the exercise of reasonable care that their advertising of their private clubs as being accessible during the membership period is false and misleading.  Further, Defendants knew or should have known that they were breaching their contracts with customers and fraudulently charging fees when they continued charging fees while their private clubs were closed.

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

88.     Plaintiffs and the California Subclass lost money or property as a result of Defendants' FAL violation because:  (a) they would not have purchased or paid for Defendants' private club memberships absent Defendants' representations and/or omissions that they would continue charging customers' credit cards and debit cards while all private clubs nationwide are closed; (b) they would not have purchased Defendants' private club memberships or would not have purchased such memberships on the same terms if true facts were known, *i.e.*, absent Defendants' representations and omissions; (c) they paid a price premium for Defendants' private club membership based on Defendants' misrepresentations and omissions; and (d) Defendants' private club memberships did not have the characteristics, benefits, or quantities as promised.

## COUNT IV

### Breach of Contract

89.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

90.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.  Plaintiffs also brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

91.     Defendants entered into contracts with Plaintiffs and Class members to provide access to private clubs in exchange for the payment of membership fees. Defendants have breached those contracts by continuing to charge Plaintiffs and Class members' debit and credit cards while their private clubs remain closed. Plaintiffs and Class members have suffered an injury through the payment of membership fees while not having access to Defendants' private clubs.

32

# COUNT V

## Breach of Express Warranty

92.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

93.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.  Plaintiffs also bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

94.     In connection with the sale of private club memberships, Defendants issues an express warranty that Defendants' private clubs are accessible to members during standard business hours (excluding select holidays) upon payment of a one-time initiation fee and recurring membership fees.

95.     Defendants' affirmation of fact and promise in Defendants' marketing and signage became part of the basis of the bargain between Defendants and Plaintiffs and Class members, thereby creating express warranties that the services would conform to Defendants' affirmation of fact, representations, promise, and description.

96.     Defendants breached their express warranty because Defendants' private clubs are not, in fact, accessible during their standard business hours or upon customers' payment of a one-time initiation fee and recurring membership fees.  In fact, Defendants charge their customers the full amount of the standard monthly membership fees while all or nearly all of their private clubs are closed.

97.     Plaintiffs and the Class members were injured as a direct and proximate result of Defendants' breach because:  (a) they would not have purchased or paid for Defendants' private club memberships absent Defendants' representations and omission of a warning that they would continue charging customers' credit and/or debit cards while all of Defendants' facilities are closed; (b) they would not have

33

purchased private club memberships on the same terms absent Defendants' representations and omissions; (c) they paid a price premium for Defendants' private club memberships based on Defendants' misrepresentations and omissions; and (d) Defendants' private club memberships did not have the characteristics, benefits, or quantities as promised.

## COUNT VI

### Unjust Enrichment/Restitution

98.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

99.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.  Plaintiffs also brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

100.   Plaintiffs and members of the Class conferred benefits on Defendants by paying, and being charged, membership fees while Defendants' private clubs were and remain closed.

101.   Defendants have knowledge of such benefits.

102.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' membership fees.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants are charging their customers full price for membership to their private clubs despite the fact that all such clubs and facilities remain closed.  These misrepresentations and charges caused injuries to Plaintiffs and members of the Class because they would not have paid Defendants' membership fees had the true facts been known.

103.   Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Class is unjust and inequitable, Defendants

34

must pay restitution to Plaintiffs and members of the Class for their unjust enrichment, as ordered by the Court

## COUNT VII

### Conversion

104.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

105.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.  Plaintiffs also bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

106.   Plaintiffs and members of the Class had a right to retain their membership fees while Defendants' private clubs were, and remain, closed; Defendants intentionally charged Plaintiffs' and Class members' debit and credit cards in the full amount of the monthly membership fees while Defendants' private clubs were closed; Plaintiffs and Class members did not consent to Defendants' charging of their debit and credit cards while Defendants' private clubs are closed; Plaintiffs and Class members were harmed through Defendants' charging of their debit and credit cards; and Defendants' conduct was a substantial factor in causing Plaintiffs and Class members' harm.

## COUNT VIII

### Money Had and Received

107.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

108.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.  Plaintiffs also brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

109.   Defendants received money in the form of membership fees that were intended to be used for the benefit of Plaintiffs and the Class.   However, those membership fees were not in fact used for the benefit of Plaintiffs and the Class, and Defendants have not given back or refunded any portion of the wrongfully collected and retained money and membership fees to Plaintiffs and the Class.

110.   Defendants obtained money in the form of membership fees that were intended to be used to provide private club access to Plaintiffs and the Class. However, Defendants have retained all of the membership fees while their private clubs remain closed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class members;

b) For an order certifying the California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the California Subclass and Plaintiffs' attorneys as Class Counsel to represent the California Subclass members;

c) For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

d) For an order finding in favor of Plaintiffs, the Class, and the California Subclass, on all counts asserted herein;

e) For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

f) For prejudgment and post-judgment interest on all amounts awarded;

g) For an order of restitution and all other forms of equitable monetary relief;

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT

h) For injunctive relief as pleaded or as the Court may deem proper; and

i) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury of all issues so triable.

Dated: June 30, 2020

/s/ Ronald A. Marron
Ronald A. Marron

**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON
MICHAEL T. HOUCHIN
LILACH HALPERIN
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        ykrivoshey@bursor.com

***Attorneys for Plaintiffs and the Proposed Class***

*Cuenco v. ClubCorp USA, Inc.*
FIRST AMENDED COMPLAINT